Number 2012-5001 NCLN20 INC v. United States Mr. Mikkel. Mr. Ellis, may it please the court. The trial court properly determined that GSA's termination in this case was performed appropriately. Now, were there mistakes made? We've already admitted that they were. They didn't provide the cure notice as required by the contract. However, they didn't provide the cure notice at that time because you have to go back and put yourself in the shoes of the contracting officer. It's easy to second guess and say that they were treated different, people were treated differently and things like that. Three weeks after the attack at 9-11, one week after a federal marshal was murdered in a federal building and the carnage was only stopped because someone was able to return fire, the contracting officer on Friday evening, September 29th, was facing the decision. Do I go home tonight hoping that NCLN20 would be able to perform on Monday, October 1st or do I terminate this contract for default because I've requested assurances... Could you extend the U.S. side contract? Mr. Dobbs and Mr. Penao said yes, Your Honor. They could have extended it pursuant to the terms of the contract. They did not in this case for several reasons. One is U.S.I. had specifically told the contracting officer that they would not perform unless it was a long-term extension. Once again, you have to remember the circumstances. This was right after 9-11 when security guard firms who had licenses and permits and more importantly weapons and ammo were at a premium and they had to make sure that they could keep their workers. Some of the events described in the Inspector General report happened before September 20th when the officer was shot. So let me ask you, under what circumstances does GSA decide to change a termination for default to termination for convenience? In this case they did it because the standard for termination for convenience has to be in the interest of the government. In this case they determined that after NCLN 20 submitted a certified claim several years after the fact and provided evidence that in fact they had started some work towards performing upon the contract. Because you have to remember, as Mr. Dobbs testified, it wasn't until the DCA audit came in that the government was put on notice that in fact NCLN 20 had done anything. Because at the time of the termination Mr. Dobbs had this information in his head. He had, I have got a request for insurance. What are the conditions that, what's the criteria that GSA uses to change the termination for default to termination for convenience? Well, I don't know if there's any set criteria, Your Honor. I think it's all fact-based and they have to look at the circumstances and determine if it's in the best interest. Well, one would certainly be, and it would presumably be the one that would apply here, I would think, is if the T for D is just not going to stand up. Well, I think that was in the back of their mind. That was pretty much in the front of their mind as far as I could see. I mean, that was the reason, wasn't it? Just frankly, between us here? I think Mr. Dobbs said he was looking at a lot of things. I think Mr. Dobbs was very concerned here and thought that maybe the T for D, but he also did know that, yes, now that I have an IG report that was written after the fact and said, you know what, you should have given that cure notice, and you know what, a year after the fact, maybe I could have extended if I had only known that, you know, if NCLN 20 had come forward and said, give us two months, that's all we need. The IG reported on issues that seem to be standard methods of operation for the GSA, like submitting notice to the SBA. I mean, isn't that a requirement under all Section 8 contracts, the prior determination that there's notice submitted to the SBA? Well, prior determination, pursuant to the FAR clause for SBA, it is. However, when the default clause in the FAR… It didn't happen until after the fact, and Mr. Dobbs testified that the reason he didn't do it because it was the end of the day Friday when he terminated. He did notify the SBA first thing that Monday morning to say that, in fact, that they were going to do a termination, and they were going to give a contract to another 8A contractor, USI. And as I said, that's an important point. It wasn't that, you know, there was no intent, specific intent, bad faith to NCLN 20. In fact, the record shows that on September 12th, right after 9-11, the assistant contracting officer actually wrote NCLN 20 and said, please, if you need any help, let us know. If you're having trouble getting your licenses or dealing with the state agencies, please contact us. But in the end, the contracting officer in this case had valid reasons for being concerned that performance wouldn't begin, and maybe in hindsight, he did convert to T4C, said maybe that's what he should have done in the first place. But in no way does the record indicate that this was in some type of bad faith or animus. And the trial court went out of its way to ensure that NCLN 20 had time to present its case to the trial court for it to determine. The trial court not only had a trial, it also did the rare occurrence where it actually traveled to Chicago to attend depositions so it could view the credibility of the government's witnesses. And after all that effort, the trial court heard their case and just determined that there's not bad faith here. Now, my understanding of termination of convenience law is that this is an animal that's effectively unique to the government. It's a privilege that the government has to unburden itself from contractual obligations that otherwise would result in anticipatory repudiation and breach damages. But that the limitation is really the only limitation effectually, at least the only one that seems to be applicable here is this bad faith notion. If we have bad faith, then it gets converted in effect to an absolute breach on the part of the government, which results in all profits that would have been earned from the contract. But what I was puzzled by and couldn't really get a sufficiently clear notion from the case law in this area is what exactly is understood by bad faith in this setting. And bad faith is one of those terms that gets a different meaning depending on its setting. What is it, your understanding of what the thrust of the case law is as to what is meant by that term as applied in this setting? Well, it appears, one is you're right, the termination of convenience clause is a creature of a sovereign. That's absolutely true. Second, from reading the case law on bad faith, as you go from the history of Torricello, and actually it's summed up well in Krasgowski, it's kind of all over the place. But really, looking at bad faith here, I think what you'd have to show is that the contractor, and because it would be a breach of contract, the contracting officer, the government, actually entered into the contract knowing it wasn't going to perform. And that's not the case here. Because in this case, we wanted to perform. We would have loved to have NCLN 20 perform, but they just didn't tell us whether, one, could they or would they. And that's all we wanted to have, so that's why we terminated it. Because Mr. Dobbs' primary mission was to make sure, on 1 October, there was armed security guards in those federal buildings. And that's why he took that action. But in this case, the record doesn't indicate that there would be bad faith, where the contracting officer actually somehow said, we're going to enter into a contract, knowing full well that there was evidence out there that knows that NCLN 20... Is there a case law that stands for that proposition? Pardon me, sir? Is there a case law that supports that? Well, I think the case law that I would look to is, like, for instance, Krizgowski talks about that, where it talks about a fraud in the inducement. Now, that was probably dictated in Krizgowski, I think, but those are the two instances when there would be... What about if the bad faith forms or gels a week after the contract is entered into? What if the intent to breach or to not fulfill the contract by the government is formed a week after? Well, there was some type of conspiracy on the part where they actually said, we're going to have specific intent to injure, or like the traditional bad faith that's described, like in the case of the Ampro or something, where there's a specific intent to injure the party. No, the bad faith you described, where the party intends that the contract not be fulfilled. Well, then I think the case law then also supports the idea that if you're going to do a termination, one, it has to be in the best interest. In some case laws talk about the fact that there has to be some type of desire to preserve the competition that's set forth in CICA, the Competition and Contracting Act. Like, you have to... there has to be... they use the term change in circumstances in some cases, for instance, like, you know, we found a better price or something, but that goes to why that's proper for the T4C. Maybe if there was not a change in circumstances, we just decided that we were going to terminate. But even the recent case law seems to support that the government can do that, as long as there's a proper basis for it. Well, that's the whole question, what constitutes a proper basis. I mean, once you say that if there is a proper basis, you can pretty much note that most everything is okay, because you've just called it proper. But, I mean, to put it more to the point... You don't have to look at this question. I mean, to give you a concrete example, I mean, suppose that after the contract is awarded, the contracting officer, who's at Abbott's Chicago Bears stand, discovers that the head of the contractor is a Green Bay fan. He decides, no, we're getting rid of him. That would be bad faith, clearly, right? Well, there would be no government interest in ensuring that a Green Bay... That would be a not a proper termination. But we have to remember that there's a presumption that the government officials are not going to go out and do something like that. And moreover, in this case, why it counsels against any bad faith is because there was a legal review. There was consult with their supervisors. You'd have to have a tremendous conspiracy, at least under these facts, to show that, in fact, that NCLN 20, that the government was conspiring to ensure that NCLN 20 wouldn't get this contract. Because the bottom line is, too, is any time there's a termination, if there's four improper basis for the termination, but one proper basis, then the proper basis still stands and the government is entitled to terminate that contract. But in this case, I think the record overall shows that the primary... That's true for termination of default. Is it true for termination under convenience, for convenience? I don't know if the case... I'm not aware that the case law would discriminate that way. I mean, the case law is pretty well settled from college boat on that if there's another basis for terminating, I don't know why it would not carry forward. But the termination of convenience clause does have some steps in there that the contracting officer has to do. And in this case, one of the problems that the contracting officer did was usually you'd have that cure notice where there could at least be a dialogue with the contractor. But the problem in this case was it just wasn't practicable to give that cure notice because if they gave that cure notice, on 1 October, there was no guarantee there was going to be guards in those federal facilities. Mr. Mickle, Mr. Ellis makes an argument that there was perjury on the part of Mr. Pinot. I want you to address that, please, because it's criminal conduct and I take it very seriously. Well, one is we'd agree with Your Honors. There's not... First off, there was no perjury. And what you must remember, too, is Mr. Pinot was the one witness the trial court actually attended his deposition and actually questioned Mr. Pinot and sat right next to him and stared at him throughout the whole deposition. So if there was any evidence of some type of perjury or any animus, you would think that the trial court, with her experience, would have been able to determine that, and that was not found. And moreover, those statements weren't inconsistent. Mr. Pinot said, I am going to review the contract, and that's what I did. The fact that Art Dobbs sent him a memo and said, please review that, that's not inconsistent. In fact, Mr. Pinot's supervisor specifically testified that one of the reasons why he got a bad efficiency report one time was he did too much review. He spent 45 days reviewing a contract instead of maybe doing some other type of action. But there was no animus. He was just a fastidious contracting officer. So I know I have a few more minutes, and unless the court has any other questions, we hope that the judgment of the trial court is determined. Thank you very much for your time. We have a couple of minutes for rebuttal, if you want to use them. Thank you. The counsel for the GSA said something very interesting, and that was that if there is a proper basis for convenience, then that vitiates bad faith. We actually think that's one of the mistakes that was made underneath. We actually believe both of those can coexist simultaneously. We fully concede that there were things going on with respect to 9-11 that reasonably made them worry. We're not going to say that there weren't, but there were options. And so the question isn't ultimately, simply was, was NCLN 20 going to perform? The question is also, what action did the GSA take? They took an action which was extraordinarily punitive, and it was not necessary. They could have actually terminated for convenience at any time. They could have terminated for convenience at any time. But instead they waited until a couple of days before performance was due to terminate for default. They weren't asked to wait in order to terminate the contract. They were asked to give their client a chance to perform. Absolutely, but there's a very big difference between give us a chance to perform and wait until the last minute and give us one day notice that you're going to terminate us for default. I think those are very, very different. But my point here is that there were circumstances that were happening, but they had options. They had options with respect to extending. They had options with, they had been making accommodations for their other contractors at the time. They could have, on September 14th, on September 16th, they could have done a termination for convenience. Why didn't they do it? Let me see if I understand. Are you saying that if they had initially terminated for convenience as opposed to terminating for default, then this case would go away? No. What I'm saying is that, what I'm saying is that the initial, I'm saying that the decision, the decision of which termination to choose. You find not the fact that they chose termination for default to be probative on the bad faith issue. It is probative, absolutely. But you're not suggesting that had they gone immediately. That's right. I'm not suggesting the opposite. But I am suggesting that it's probative and what is clear from the record below is that the trial court never considered this. The trial court simply didn't look at this context. And then again, when you put it in line with all the other evidence, how they handled the MIB, the misreading of the, quite frankly, the bullying behavior with respect to the MIB, the failure to give notice to the SBA, which was necessary under the MOU, so that the SBA could intervene and try and make this contract still work. That's the purpose there. And when they short-circuited that process by telling appellant at the last possible minute, oh, by the way, you have 24 hours, they basically knowingly left these people no ability whatsoever to cure. And that is what we are saying is absolute evidence of bad faith. And for that reason, we would ask you to reverse the lower court and remand it for damages, quite frankly. Thank you. We thank both counsel. The case is submitted.